**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| HORTENCIA M. CHAVIRA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 11-CV-00262 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry # 3). Cross-motions for summary judgment have been filed by Plaintiff Hortencia M. Chavira ("Plaintiff," "Chavira"), and Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment and Supporting Brief ["Plaintiff's Motion"], Docket Entry #9); (Defendant's Cross-Motion for Summary Judgment, Docket Entry #8); (Memorandum in Support of Defendant's Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry # 8, Ex. 1). Each party has responded in opposition to the other's motion. (Reply to Plaintiff's Motion for Summary Judgment and Supporting Brief ["Defendant's Response"], Docket Entry # 10; Plaintiff's Reply Brief In Response to Defendant's Reply to Plaintiff's Motion for Summary Judgment ["Plaintiff's Reply"], Docket Entry #11). After a review of the pleadings, the evidence presented, and the applicable law, it is **RECOMMENDED** that Defendant's motion be **GRANTED**, and that Plaintiff's motion be **DENIED**.

1

**BACKGROUND**

On February 28, 2006, Plaintiff Hortencia Maria Chavira filed an application for Supplemental Security Income benefits ("SSI"), under Title XVI of the Social Security Act ("the Act"). (Transcript ["Tr."] at 131). Plaintiff claimed that her disability began on May 1, 2005, due to "[s]troke, hypertension, depression, neck nerve damage, [and] diabetes." (Tr. at 124). On July 12, 2006, the SSA denied her application for benefits. (Tr. at 71-75).

Plaintiff petitioned the SSA to reconsider that decision, but that request was denied. (Tr. at 82-84). On March 20, 2007, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. at 85). That hearing, before ALJ Darren Hammer, took place on November 17, 2008. (Tr. at 27). Plaintiff appeared with an attorney, Luke Radney ("Mr. Radney"), and she testified in her own behalf. (Tr. at 29, 33-53). The ALJ also heard testimony from Plaintiff's son, Rubin Barbeda, and from a vocational expert witness Byron Pettingill ("Mr. Pettingill"). (Tr. at 30, 53-58, 58-64, 173).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.    An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.    An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.      If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well settled that, under this analysis, the claimant bears the burden to prove any disability that is relevant to the first four steps.  *See Wren*, 925 F.2d at 125.  If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy.  *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that he suffers from a disability.  *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months."  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). "Substantial gainful activity" is defined as

"work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452.  A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)).  Further, the impairment must be so severe as to limit the claimant so that "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ found that Chavira had "not engaged in substantial gainful activity since February 28, 2006, the application date."[1]  (Tr. at 15).  Further, the ALJ concluded that Chavira suffered from the following impairments:

> [D]iabetes mellitus, type 2, with peripheral vascular insufficiency; hypertension, with chest pain; gastritis and gastroesophageal reflux disease; generalized pain syndrome involving the cervical and lumbosacral spine; left shoulder pain, status post a history of subclavian blood clot in the left upper extremity following breast lumpectomy and chemotherapy in 1994 and 1995; obesity; and situational depression and generalized anxiety, with possible body dysmorphic syndrome related to the lumpectomy, secondary to history of cancer and treatment.

(*Id.*).  Although he determined that these impairments were "severe," the ALJ decided that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" in the applicable SSA regulations.  (Tr. at 16).  The ALJ then determined that, even though Chavira was unable to perform her "past relevant work," she

---

[1] The ALJ noted, however, that "The claimant worked after the established disability onset date, but this work activity did not rise to the level of substantial gainful activity.  The claimant testified that she worked as a sitter for her grandmother in 2007, but her earnings record documents that she earned less than $5,000 for the year."  (Tr. at 15).

had the residual functional capacity ("RFC") to perform some "sedentary work."  (Tr. at 18, 24).

However, he placed the following limitations on such work: "no overhead lifting"; "occasional

overhead reaching with the left arm"; "simple, repetitive instructions" only; and "occasional

public contact."  (Tr. at 18).  The ALJ further found that "there are jobs that exist in significant

numbers in the national economy that the claimant can perform."  (Tr. at 25).  For that reason,

the ALJ concluded that Chavira "has not been under a disability, as defined in the Social

Security Act, since February 28, 2006, the date the application was filed," and he denied her

application for insurance benefits on March 25, 2009.  (Tr. at 26).

On April 28, 2009, Plaintiff requested an Appeals Council Review of the ALJ's decision.

(Tr. at 8).  The Appeals Council found no reason to review the ALJ's decision and denied her

request, on November 30, 2010.  (Tr. at 1).  With that ruling, the ALJ's findings became final,

and, on January 12, 2011, Chavira filed this suit, pursuant to section 205(g) of the Act (codified

as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Complaint, Docket Entry #1).

After a review of the pleadings, the evidence presented, and the applicable law, it is

**RECOMMENDED** that Defendant's motion be **GRANTED**, and that Plaintiff's motion be

**DENIED**.

**STANDARD OF REVIEW**

Federal courts review the Commissioner's denial of disability benefits only to ascertain

whether the final decision is supported by substantial evidence and whether the proper legal

standards were applied.  *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496

(5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they

must be affirmed."  *Id*. (citing *Martinez*, 64 F.3d at 173).  "Substantial evidence is such relevant

evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere

scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see*

*Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On

review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to

determine whether it contains substantial evidence to support the Commissioner's decision."

*Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302

(5th Cir. 1987).  In making this determination, the court must weigh the following four factors:

the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary

questions of fact; Plaintiff's own testimony about his condition; and Plaintiff's educational

background, work history, and present age.  *See Wren*, 925 F.2d at 126.  If no credible

evidentiary choices or medical findings exist that support the Commissioner's decision, then a

finding of no substantial evidence is proper.  *See Johnson*, 864 F.2d at 343.

**DISCUSSION**

In her motion, Chavira asks the court to "reverse the ALJ's decision and remand for an

award of benefits or, in the alternative, additional administrative proceedings."  (*See* Plaintiff's

Motion at 18) (emphasis omitted).  Plaintiff argues that the ALJ "[i]mproperly evaluated [her]

mental impairment."  (Plaintiff's Motion at 4).  More specifically, Chavira claims that the ALJ

did not consider her "inability to afford medical treatment," and that he "mischaracterize[ed]" the

evidence on her daily activities.  Plaintiff also complains that the ALJ rejected the opinion from

Dr. Whitley, a consulting physchologist, and that he "[f]ailed to consider Plaintiff's mental

impairments under Listing 12.07, "pertaining to Somatoform Disorders."  (*Id*. at 4-6, 8, 10).

Next, Chavira argues that the ALJ erred in determining her residual functional capacity ("RFC").

(*Id*. at 11).  On that point, she argues that the ALJ did not "adequately analyze the impact of

Plaintiff's obesity on her ability to work," and that he did not discuss the side effects from her

medication.  (Plaintiff's Motion at 15-16).  In addition, Plaintiff complains that the ALJ made an "improper step five finding," because of a flawed hypothetical question to the vocational expert witness.  (*Id*. at 17).  Finally, she contends that the ALJ additionally erred at step five, because he did not "perform a function-by-function analysis of Plaintiff's RFC," to "assess her ability to perform these functions on a regular and continuing basis."  (*Id*. at 17-18).  Defendant, on the other hand, insists, that the ALJ "properly evaluated Plaintiff's claim," and that substantial evidence supports his decision to deny her benefits.  (Defendant's Motion at 3-10).

### *Medical Facts, Opinions, Diagnosis*

The earliest available medical records show that Plaintiff was hospitalized in the Memorial Hermann Hospital System from February 1 through February 10, 1998.  During that hospitalization, a neurologist, Cheor Kim, MD ("Dr. Kim") attended Plaintiff for "evaluation of painful weakness of the left arm and shoulder."  (Tr. at 306-20).   Dr. Kim detailed Chavira's medical history, and he noted that she had also been hospitalized the previous month for a "similar condition," as well as "severe low back pain."  (Tr. at 307, 309).  However, a CT scan showed her cervical spine to be normal.  (*Id*.).  Dr. Kim also reported that, during an office visit in December 1997, "[h]er final endoscopic findings were further delineated as gastroesophageal reflux disorder with chronic gastritis."  (Tr. at 309).  He did note, however, that Plaintiff had suffered a "transient ischemic attack."[2]

During her hospital stay, Dr. Kim "felt that [Plaintiff] had brachial plexopathy,"[3] for which he "initiated [] heparin[4] treatment."  (Tr. at 307).  Dr. Kim reported "dramatic clinical

---

[2] "A transient ischemic attack (TIA) is when blood flow to a part of the brain stops for a brief period of time. A person will have stroke-like symptoms for up to 1-2 hours."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001743/ (last visited February 22, 2012).

[3] "Brachial plexopathy is pain, decreased movement, or decreased sensation in the arm and shoulder due to a nerve problem."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002391/ (last visited February 20, 2012).

improvement," but he later discontinued the "anticoagulant treatment," because he discovered Plaintiff to be anemic.  (Tr. at 307).  A mammogram taken during that visit showed there to be "no change …. when compared to prior studies."  (Tr. at 347).  In addition, an image "of [Chavira's] left upper limb appear[ed] to be unremarkable."  (Tr. at 349).  On February 2, 1998, Plaintiff complained to Dr. Kim that she had "a difficult time putting on t-shirts," but four days later, Chavira reported decreased arm pain "after exerc[ise] [and] slow stretching."  (Tr. at 351-52).  Dr. Kim "decided to discharge" Chavira, and "follow [her] on an outpatient basis."  (*Id*.).  Upon discharge, on February 10, 1998, Chavira was diagnosed as suffering from the following ailments: "Recurrent transient ischemic attack, right middle cerebral arterial territory"; "[c]hest pain of multifactorial origin"; "[c]ardiac arrhythmias"; "[r]ecurrent weakness of unknown etiology"; "[h]istory of Port-A-Cath[5] malfunction"; "[p]hlebitis[6] of brachial vein"; "[r]eactive depression"; and a "[h]istory of breast carcinoma."  (*Id*.).

The next set of records detail Plaintiff's subsequent visits to the Memorial Hermann Healthcare System, through August 29, 2005.  (Tr. at 260-375).  These records pertain to four different emergency room visits, on December 11, 1998; on February 10, 1999; on December 6, 2002; and on August 29, 2005.  In December 1998, Plaintiff went to the emergency room complaining of swelling in her left arm.  (Tr. at 357-58).  Dr. Kim again admitted Chavira for "further evaluation and treatment."  (Tr. at 359).  During that visit, Plaintiff underwent a number of x-rays, which revealed "no significant abnormality [] identified in the lungs, heart or

---

[4] "Heparin is an anticoagulant (blood thinner) that prevents the formation of blood clots."  Drugs.com, http://www.drugs.com/heparin.html (last visited on February 20, 2012).
[5] "Port-A-Cath"® is a medical device that is "[d]esigned to permit repeated access to the venous system for the parenteral delivery of medications, fluids, and nutritional solutions and for the sampling of venous blood."  Smiths Medical, http://www.smiths-medical.com/catalog/implantable-ports/port-cath-implantable-venous.html (last visited February 20, 2012).
[6] "Phlebitis," or "thrombophlebitis," is the "inflammation of a vein, often accompanied by formation of a clot."  MOSBY'S at 1613.

mediastinum," and "no evidence of deep vein thrombosis" or "other significant osseous[7] abnormality" in her left arm.   (Tr. at 365-67).   Dr. Kim discharged Plaintiff after one day, diagnosing her with "painful swelling of [the] left upper extremity of unknown etiology," as well as a "history of subclavian vein thrombosis," from a "Port-A-Cath" that was improperly removed following chemotherapy.   (Tr. at 357).

In February 1999, Chavira again presented to the emergency room, complaining of left arm pain that radiated to her fingers.   (Tr. at 276-77).   Plaintiff was given pain relievers and discharged in stable condition.   (Tr. at 278-80).

In 2002, Plaintiff sought treatment at the emergency room for left "upper chest pain," left "arm numbness," and "jaw/neck numbness."   (Tr. at 266).   She described these pains as "stabbing," and "constant." (*Id.*).   The attending staff member reported Chavira's history of "similar pains," a "subclavian[8] blood clot" after receiving chemotherapy from a Port-A-Cath, a "lumpectomy," a "hysterectomy," "obesity," "hypertension," and "anxiety."   (Tr. at 285-86, 302, 357).   A chest x-ray taken that day was "normal," however.   (Tr. at 296).   Sarah Svoboda, MD ("Dr. Svoboda") diagnosed Plaintiff as suffering from "atypical chest pain," and "possible musculoskeletal" pain, for which she prescribed Darvocet,[9] a pain reliever, and nitroglycerin.[10] (Tr. at 287, 305).   Dr. Svoboda discharged Chavira in stable condition and urged her to follow up with a cardiologist, "Dr. Morris," at the "clinic." (*Id.*).   There is no record that Plaintiff did so.

---

[7] Osseous means "bony," or "consisting of or resembling bone." MOSBY'S at 1164.

[8] "Subclavian" means "situated under the clavicle." MOSBY'S at 1555.

[9] Darvocet "contains a combination of propoxyphene and acetaminophen. Propoxyphene is in a group of drugs called narcotic pain relievers. Acetaminophen is a less potent pain reliever and a fever reducer that increases the effects of propoxyphene. Darvocet is used to relieve mild to moderate pain with or without fever."  Drugs.com, http://www.drugs.com/darvocet.html (last visited February 20, 2012).

[10] Nitroglycerin is "used to treat episodes of angina (chest pain) in people who have coronary artery disease (narrowing of the blood vessels that supply blood to the heart)."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0000807/ (last visited February 19, 2012).

On August 28, 2005, Plaintiff again appeared at the emergency room complaining of chest pain. (Tr. at 262). These records note Plaintiff's medical history of hypertension and breast cancer, including a left breast lumpectomy, and left shoulder surgery. (Tr. at 265). Rob Carpenter, MD ("Dr. Carpenter") attended Chavira that day, and he ordered her to undergo laboratory tests, and two chest x-rays. (Tr. at 264, 266). The findings from those x-rays revealed "no infiltrates,[11] effusions[12] or pneumothorax.[13]" (Tr. at 272). In addition, Plaintiff's "cardiomediastinal silhouette [was] normal," and there was "[n]o acute pulmonary disease." (*Id.*). Dr. Carpenter diagnosed Plaintiff as suffering from "[a]typical chest pain" and he discharged her in "good" condition the same day. (Tr. at 266).

The next set of records show that Plaintiff sought regular treatment from Prabhu Patil, MD ("Dr. Patil") during 2004 and 2005. (Tr. at 460-88). Chavira had eleven visits with Dr. Patil, from March 2, 2004 through August 25, 2004. During that time, Plaintiff complained of pain in her chest, stomach, back, and left arm, as well as "anal bleeding," and hypertension. (Tr. at 473-83). She also claimed to lose sleep because of the pain. (Tr. at 478). Throughout these visits, Dr. Patil diagnosed Plaintiff as suffering from GERD, hypertension, obesity, and anxiety.[14] (*Id.*). Dr. Patil prescribed Nexium,[15] Clonidine,[16] Diovan,[17] Xanax, Flexeril,[18]

---

[11] An "infiltrate" is "a substance that seeps through a filter." *Id*. at 837.

[12] An "effusion" is "the escape of fluid, for example, from blood vessels as a result of rupture or seepage, usually into a body cavity." *Id*. at 537.

[13] "Pneumothorax" is "a collection of air or gas in the pleural space causing the lung to collapse." *Id*. at 1281.

[14] There are other diagnoses in those records which are illegible. (Tr. at 473-83).

[15] Nexium, or "Esomeprazole[,] is used to treat gastroesophageal reflux disease (GERD)." U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001062/ (last visited February 22, 2012).

[16] "Clonidine is used alone or in combination with other medications to treat high blood pressure." U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000623/ (last visited February 22, 2012).

[17] "Diovan" is a brand name for "Valsartan," which "is used alone or in combination with other medications to treat high blood pressure." *Id*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001001/ (last visited February 22, 2012).

[18] Flexeril, or "Cyclobenzaprine," is "a muscle relaxant, [and] is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000699/ (last visited February 21, 2012).

Prevacid, Toprol,[19] and aspirin.  (*Id.*).  These records detail the fact that Chavira missed two appointments and she "did not call to cancel."  (Tr. at 473, 480).

Plaintiff did not see Dr. Patil again until six months later.  (Tr. at 483, 472).  She then sought treatment from him nine times, between March 4, 2005, and November 9, 2005.  (Tr. at 464-72).  At those appointments, Chavira complained of stomach pain, pain and numbness in her left arm, right arm pain, "spine pain," "numbness in [her] ri[gh]t hand," chest palpitations, "dizziness," a "slow heart beat [sic]," nausea, and "migrane headaches."  (*Id.*).  On May 13, 2005, Plaintiff reported that she had "continued pain" from the "nerve and cartilage surgery" she had undergone the week before.[20]  (Tr. at 469).  The next month, Plaintiff had "a torn rotator cuff" in her left shoulder.  (Tr. at 468).  Dr. Patil found Plaintiff to have hypertension, GERD,[21] a herniated disk, left shoulder and "r[igh]t arm" pain, anxiety, depression, and "papules."[22]  For those ailments, Dr. Patil continued Plaintiff's existing prescription regimen, but also added Pravachol[23] and Lortab.[24]

On March 27, 2006, Plaintiff was again hospitalized, for "fever," "chills," and an "abdominal wall infection."  (Tr. at 207).  "[C]ellulitis"[25] was found in her "[a]bdominal wall"

---

[19] "Toprol," or "Metoprolol[,] is used alone or in combination with other medications to treat high blood pressure." *Id.*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000795/ (last visited February 22, 2012).

[20] There is no record of that surgery.

[21] "GERD" is an abbreviation for "Gastroesophageal reflux disease," which "is a condition in which the stomach contents (food or liquid) leak backwards from the stomach into the esophagus (the tube from the mouth to the stomach)."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001311/ (last visited February 21, 2012).

[22] There are also other diagnoses in those records which are illegible.  (Tr. at 464-72).

[23] Pravachol is also known as "Pravastatn," which "s used together with lifestyle changes (diet, weight-loss, exercise) to reduce the amount of cholesterol (a fat-like substance) and other fatty substances in the blood."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000908/ (last visited February 22, 2012).

[24] "Lortab contains a combination of acetaminophen and hydrocodone. Hydrocodone is in a group of drugs called narcotic pain relievers. Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone." Drugs.com, http://www.drugs.com/lortab.html (last visited February 22, 2012).

[25] "Cellulitus" is "a diffuse, acute infection of the skin and subcutaneous tissue characterized most commonly by local heat, redness, pain, and swelling, and occasionally by fever, malaise, chills, and [a] headache.  Abscess and tissue destruction usually follow if antibiotics are not taken.  The infection is more likely to develop in the presence

and her "[p]edal pulses"[26] were only "fair." (*Id.*). In these records, her medical history detailed a previous hysterectomy and the lumpectomy of the left breast. (*Id.*). During her daily check-ups, Dr. Patil found Chavira's chest, heart, and lungs to be "unremarkable." (Tr. at 203-05). On March 31, 2007, Plaintiff had surgery to drain the abscess,[27] but she "tolerated" the surgery well, and on April 1, 1006, Dr. Patil discharged her. (Tr. at 201-02). He prescribed "Clindmycin"[28] and "Duricef,"[29] as well "Glucophage"[30] for Chavira's diabetes, and "Vicodin" for pain. (*Id.*).

Three weeks later, Chavira returned to Dr. Kim, complaining of "[r]ecurrent low back pain and painful swelling of [her] right inguinal[31] area[,] along with [a] recurrent headache." (Tr. at 199). Dr. Kim admitted Plaintiff to the hospital for "further evaluation and management." (*Id.*). In the hospital, Plaintiff was again examined by Dr. Patil. (Tr. at 198, 488). Dr. Patil observed the following: that "[d]iabetes mellitus [was] recently detected"; that Chavira's "[b]lood sugar is high"; that "[m]ild hypertension was present[ but] controlled with Lotrel"; and that [Plaintiff] was "obese." (*Id.*). He found cellulitus in Plaintiff's abdomen area, and reported her "pedal pulses" to be "fair." (Tr. at 198, 488). The next day, Chavira "continue[d] to complain of left-sided chest pain [that would] radiat[e] to [her] left arm." (Tr. at 197). After being "[o]bserve[d] for 24 hours," Dr. Patil discharged Plaintiff. (Tr. at 196). He noted that she was "stable"; that an "[e]xamination reveal[ed] [her] chest [to be] clinically clear"; that her

---

of damaged skin, poor circulation, or diabetes mellitus." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY at 290 (5th Ed. 1998).

[26] Pedal "pertain[s] to the foot." *Id.* at 1223.

[27] "Abscess" is "a cavity containing pus and surrounded by inflamed tissue, formed as a result of suppuration in a localized infection (characteristically a staphylococcal infection). *Id.* at 7.

[28] "Clindamycin is used to treat certain types of bacterial infections, including infections of the lungs, skin, blood, female reproductive organs, and internal organs." U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000672/ (last visited February 19, 2012).

[29] Duricef, also known as "Cefadroxil[,] is a cephalosporin antibiotic used to treat certain infections caused by bacteria such as skin, throat, and urinary tract infections." U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000760/ (last visited February 19, 2012).

[30] "Glucophage" is an "oral antidiabetic agent." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY at 698 (5th Ed. 1998).

[31] Inguinal "pertain[s] to the groin." MOSBY'S at 839.

"[a]bdomen [was] soft"; and that her "[c]ellulitis" [was] improving."  (*Id*.).  He ordered Plaintiff to continue the antibiotics he had previously prescribed for her, as well as "all her at home medications."  (Tr. at 196).

Between November 2, 2006, and June 13, 2008, Plaintiff sought regular treatment from Dr. Kim. (Tr. at 388-459).  From November 2006, through October 2007, Plaintiff complained to Dr. Kim of "generalized weakness and slowness," and "pain all over her body."  (Tr. at 456). More specifically, she claimed to have "neck pain" that "radiate[d] to both [of] her limbs," "lower back pain," "abdominal pain," insomnia, "anxiety," and "headaches" that were "associated [with the] neck pain."  (Tr, at 442, 446, 454, 456).  During her visit on November 2, 2006, Plaintiff reported to be "improving in [her] overall medical condition [since] she [] started seeing Dr. Kim."  (Tr. at 454).  During these visits, Dr. Kim observed Plaintiff to be "mildly anxious and depressed."  (Tr. at 452, 458).  Dr. Kim found her to exhibit "[n]o pedal edema or swelling," and noted that her "gait station" was "normal."  (Tr. at 434-59).  However, on more than one occasion, Dr. Kim found "lumbosacral tenderness," restricted neck movement, and that Plaintiff's "motor/sensory system" was "slightly decreased in the lower limbs."[32]  (*Id*.).  In addition, Dr. Kim observed "[p]eripheral vascular insufficiency"[33] due to diabetes, and "point tenderness in [the] L4-5 region with a cessation of movement."  (*Id*.).

From these findings, Dr. Kim assessed Chavira with a number of illnesses that seemed to vary from visit to visit.[34]  The diagnoses that appeared most frequently, however, were:

---

[32] On September 17, 2007, Dr. Kim observed that Plaintiff's "bluish discoloration in both lower extremities was more prominent."  (Tr. at 401).
[33] "Peripheral vascular disease" is "any abnormal condition that affects the blood vessels outside the heart and the lymphatic vessels."  MOSBY'S at 1241.
[34] Dr. Kim found Chavira to suffer from hypertension, "[c]ervical radiculopathy," "dumping syndrome," "[l]upus erythematosus," "GERD," "stocking and glove distribution," a "[s]eizure disorder," "generalized pain syndrome," possible "abdomen carcinoma," "failed back," "osteoporosis," and "COPD."  (Tr. at 435-459*)*.

"lumbosacral radiculopathy,"[35] "diabetic polyneuropathy," "diabetes mellitus," "headaches,"
"insomnia," "pancreatitis," and "panic attacks."   (Tr. at 435-59).   Dr. Kim prescribed Chavira
medications which included the following: Nizoral cream,[36] Vicodin, BuSpar,[37] Restoril,[38]
Lotrel, and K-Dur,[39] Flexeril, Lipitor,[40] Levaquin,[41] Phenergan[42] with Codeine, Ambien,
Metformin,[43] Zoloft[44] 10, Neurontin,[45] and Palgic.[46]   (Tr. at 435, 449, 457).   Dr. Kim also gave
Plaintiff samples for "Zyprexa,"[47] and he "referred [Chavira] to the internal medical doctor for
her seizure control."   (Id.).   Further, on at least five occasions, Dr. Kim recommended that
Chavira "go for [a] home health care evaluation," as well as to the "oriental medical doctor for
acupuncture therapy," to help control her diabetes.   (Tr. at 440, 443, 445, 449, 451).   The
neurologist ordered Plaintiff to undergo an MRI, x-rays of her chest, pelvis hips, and "sinus[es],"

[35] "Lumbosacral" pertains "to the lumbar vertebrae and the sacrum."  MOSBY'S at 961.  "Radiculopathy" is "a
disease involving a spinal nerve root."  Id. at 1377.

[36] Nizoral cream, is a brand name of "Ketoconazole cream," which is used to treat skin infections.  U.S. National
Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000297/ (last visited February 20, 2012).

[37] "Buspirone is used to treat anxiety disorders."  Id., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000876/
(last visited February 20, 2012).

[38] "Restoril" is a brand name for "Temazepam," which "is used on a short-term basis to treat insomnia."  Id,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000808/ (last visited February 20, 2012).

[39] "K-Dur is used to prevent or to treat low blood levels of potassium (hypokalemia)."  Drugs.com,
http://www.drugs.com/k-dur.html (last visited February 20, 2012).

[40] Lipitor, or "Atorvastatin[,] is used along with diet, exercise, and weight-loss to reduce the risk of heart attack and
stroke and to decrease the chance that heart surgery will be needed in people who have heart disease or who are at
risk of developing heart disease."  Id., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000009/ (last visited
February 21, 2012).

[41] Levaquin is an antibiotic that "treats infections such as pneumonia; chronic bronchitis; and sinus, urinary tract,
kidney, prostate (a male reproductive gland), and skin infections."  Id., http://www.ncbi.nlm.nih.gov/pubmedhealth/
PMH0000129/ (last visited February 21, 2012).

[42] Phenergan, or "Promethazine[,] is used to relieve the symptoms of allergic reactions such as allergic rhinitis
(runny nose and watery eyes caused by allergy to pollen, mold or dust), allergic conjunctivitis (red, watery eyes
caused by allergies), allergic skin reactions, and allergic reactions to blood or plasma products.  Id.,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000637/ (last visited February 21, 2012).

[43] Metformin is the generic name for Glucophage, which is used to treat diabetes.  Id.,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000974/ (last visited February 21, 2012).

[44] Zoloft is used to treat depression and panic attacks.  Id., http://www.ncbi.nlm.nih.gov/pubmedhealth/
PMH0001017/ (last visited February 21, 2012).

[45] Gabapentin is "used to help control certain types of seizures in people who have epilepsy."  Id.,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940/ (last visited February 21, 2012).

[46] Palgic, or "carbinoxamine[,]is an antihistamine that reduces the effects of natural chemical histamine in the body.
Histamine can produce symptoms of sneezing, itching, watery eyes, and runny nose."  Drugs.com,
http://www.drugs.com/mtm/palgic.html (last visited February 21, 2012).

[47] Zyprexa, or "olanzapine," is "used to treat the symptoms of schizophrenia."  U.S. National Library of Medicine,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000161/ (last visited February 21, 2012).

and a pelvic ultrasound.  (Tr. at 443, 457).  Finally, Dr. Kim "sent [Chavira] to the lab [to obtain a] comprehensive metabolic profile and [a] urinary drug screening."  (Tr. at 449).  The record contains no test results or records from Dr. Kim's suggested treatment, so it appears that Plaintiff never followed these recommendations.  (Tr. at 194-488; s*ee generally* Tr. at 401).

On October 24, 2007, Plaintiff saw Dr. Kim for recurrent head and abdominal pain.  (Tr. at 431).  Dr. Kim observed an infection in Plaintiff's right arm, and he advised her to "seek immediate medical attention at Parkway Hospital." (Tr. at 431).  Instead, Plaintiff was admitted to Doctors Hospital the next day, complaining of abdominal pain.  (Tr. at 395, 430).   In the hospital, Chavira had a chest x-ray, which revealed "no active disease."  (Tr. at 430).  An x-ray of her gallbladder showed that it was normal, although her liver was "slightly englarged."  (Tr. at 416, 429).  On October 29, 2007, Patrick Joseph, M.D. ("Dr. Joseph") examined Plaintiff and found her abdomen to be tender.  (Tr. at 412; *see also* Tr. at 403, 407).  Dr. Joseph ordered an ultrasound of Plaintiff's right armpit, as well as an abdominal ultrasound, an abdominal CT[48] scan, and an "upper endoscopy."  (*Id.*).

The first of those tests, an EGD,[49] revealed that Plaintiff suffered from "gastritis," and GERD.  (Tr. at 409).  A surgeon, Arunkumar Shah, MD, prescribed Zantac,[50] and placed Plaintiff on a "bland diet."  (*Id.*).  An ultrasound of Chavira's right armpit revealed a "palpable mass" that contained a "lymph node with nonspecific adjacent small fluid collection."  (Tr. 417).  The CT scan of Plaintiff's abdomen indicated that the "liver, contracted gallbladder, spleen, pancreas, adrenal glands, kidneys and abdominal aorta appear[ed] normal."  In addition, her

---

[48] "CT" is an abbreviation for "computed tomography," which is a "radio-graphic technique that produces a film that represents a detailed cross section of tissue structure."  MOSBY'S at 378.

[49] "EGD" is an abbreviation for "esophagogastroduodenoscopy, which "is a test to examine the lining of the esophagus (the tube that connects your throat to your stomach), stomach, and first part of the small intestine. It is done with a small camera (flexible endoscope) which is inserted down the throat."  Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/003888.htm (last visited February 21, 2012).

[50] Zantac is a brand name for "Ranitidine," which is used to treat ulcers and GERD.  *Id.*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000094/ (last visited February 21, 2012).

"stomach and visualized large and small bowel loops appear[ed] normal, [although] … [a] small fat containing umbilical hernia [wa]s noted."  (Tr. at 415).  Plaintiff also had a chest x-ray that day which was normal.  (Tr. at 414).

On November 1-2, 2007, Plaintiff's abdomen remained "tender," and she was scheduled to receive antibiotics for the "cellulitis" in her right armpit.  (Tr. at 424-25).  During those two days, Dr. Kim reported the following diagnoses: "Hidradenitis suppurativa";[51] "Poor peripheral vein"; "Bipolar disorder"; "Recurrent right upper quadrant pain"; "Recurrent urinary tract infection"; "diabetes mellitus"; "chronic lumbar instability"; "hypertension"; "Chronic obstructive lung disease"; "Supraventricular tachycardia"; "Nonspecific tendonitis of shoulders"; "Cervical radiculopathy"; and "Postprandial emptying syndrome."  (Id.).  Plaintiff was taking Darvocet and Zyprexa, and she was also prescribed other pain relievers, as well as Norvasc,[52] Zestril,[53] Pepcid, and Vancomycin.[54]  (Tr. at 396-99).  Chavira was discharged from the hospital on November 5, 2007.

Chavira followed up with Dr. Kim two days later.  (Tr. at 394).  He informed Plaintiff of "the possibility of recurrent chronic pancreatitis," and noted that she had "L4-L5 lumbar radiculopathy," as well as a "left ankle sprain," and "recurrent chest pain."  (Id.).  However, there are no objective test results to document these ailments.  On November 21, 2007, Plaintiff again

---

[51] Hidradenitis suppurativa (HS) is a chronic disease of a type of sweat gland … It causes long-term skin inflammation and can be painful."   Medline Plus, http://www.nlm.nih.gov/medlineplus/ hidradenitissuppurativa.html  (last visited February 27, 2012).  On November 1, 2007, Dr. Kim noted that this condition was "improving," but the next day, he found it to be "increasing in size."  (Tr. at 424-25).

[52] Norvasc, or "Amlodipine[,] is used alone or in combination with other medications to treat high blood pressure and chest pain (angina)."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0000914/ (last visited February 21, 2012).

[53] Zestril is high blood pressure medication.  Id., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000917/ (last visited February 21, 2012).

[54] "Vancomycin is used to treat colitis (inflammation of the intestine caused by certain bacteria) that may occur after antibiotic treatment."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0000282/ (last visited February 21, 2012).

visited Dr. Kim, to remove the "suture" from the "Port-a-Cath" site.[55]  (Tr. at 391-92).  Dr. Kim noted Plaintiff's blood pressure reading of "168/100," and he added that Chavira "has been complaining of severe pain in the chest with [a] physical finding of marked attenuation of breathing in the right upper lung for which the patient was guided to have [a] chest x-ray as well as [a] CT scan of [her] chest for possible cellulitis and abscess of the chest wall."  (Tr. at 391-92).  On January 21, 2008, Plaintiff again complained to Dr. Kim of "painful swelling in her right armpit.  (Tr. at 390).  Dr. Kim observed an "abscess in [her] right armpit," and he referred her to Dr. Joseph for "further consultation."  (Tr. at 390).  Nearly five months later, on June 13, 2008, Plaintiff's saw Dr. Kim again.  (Tr. at 389).  On that day, she sought treatment for "episodic mental confusion."  (*Id*.).  Chavira claimed to have "lost track of [when she should] follow-up," because she had "lost her insurance benefit."  (*Id*.).  Dr. Kim concluded that her "physical" and "neurological examination remains … characterized by [a] recurrent lumbar sprain with chronic lumbar instability."  (*Id*.).

The next set of records detail a Physical Residual Functional Capacity Assessment" of Chavira, done by Robin Rosenstock, M.D. ("Dr. Rosenstock"), on May 25, 2006.  (Tr. at 224-31).  Dr. Rosenstock listed Plaintiff's "primary diagnosis" as hypertension and coronary artery disease, and her "secondary diagnosis" as diabetes.  (Tr. at 224).  Dr. Rosenstock, acting on behalf of the SSA, found that Chavira could "lift and/or carry" items weighing "20 pounds" "occasionally"; could "lift and/or carry" items weighing "10 pounds" "frequently"; could "stand and/or walk (with normal breaks)," and could "sit (with normal breaks)" for "about 6 hours in an 8-hour workday."'  Dr. Rosenstock found that Chavira was otherwise "unlimited" in her ability to "push and/or pull."  (Tr. at 225).  In addition, Dr. Rosenstock found Plaintiff to have no

---

[55] Apparently, Dr. Joseph was supposed to remove Plaintiff's suture, but she "lack[ed]" the "transportation" to see him.  (Tr. at 391-92).

"postural limitations," manipulative limitations," "visual limitations," "communicative limitations," or "environmental limitations."  (Tr. at 226-28).  Dr. Rosenstock also noted that, although Plaintiff "alleges [a] stroke," there are "no records of stroke in [her medical] history and physical exams."  (Tr. at 225).  Dr. Rosenstock reported further that Plaintiff's diabetes could be "controlled with suggested change and Glucophage"; that Chavira's chest x-rays were "unremarkable"; that she had "stable" blood pressure"; and that her heart "sounds normal."  (Tr. at 225).  Finally, Dr. Rosenstock noted that in her activities of daily living, Plaintiff stated that she was "able to do light housework and walk outside sometimes."  (Tr. at 225).  Dr. Rosenstock concluded that Chavira's "allegations are partially credible."  (Tr. at 229).

On June 5, 2006, Plaintiff was seen by Jim C. Whitley, Ed.D ("Dr. Whitley"), "a clinical psychologist."  (Tr. at 253).  Dr. Whitley noted that Chavira "does not speak that well in English and she brought her [15 year-old] daughter to the evaluation not being aware that the examiner spoke Spanish."[56]  (Id.).  Dr. Whitley observed that Plaintiff "looked older than her stated age," and that "her attire and grooming habits [] reflect[ed] middle to lower" socioeconomic status.  (Id.).  He reported that Chavira "provide[d] her own history," and that "[t]here were no medical or school records available."  (Id.).  Dr. Whitley remarked that Plaintiff's reasons for seeking social security benefits were that she "ha[d] been having problems."  (Id.).  Plaintiff told him, "It started in 1994 with breast cancer, depression and panic attacks and I have not been able to work."  (Id.).  As to her medical history, Chavira told Dr. Whitley that when she was diagnosed with breast cancer, in 1994, she "underwent a radical mastectomy," as well as "radiation and chemotherapy."  (Tr. at 254).  Plaintiff explained that "[t]he depression started after that [surgery] when she stopped feeling like a woman."  (Id.).  She also stated that her husband had

---

[56]  Later in his evaluation, however, Dr. Whitley found that Chavira's "speech was coherent and relevant in English and Spanish."  (Tr. at 256).

left her, which "contributed to her depression."  (Tr. at 255).  According to Chavira, her ex-husband "could not handle the mastectomy and that was part of the reason he left."  (Tr. at 255).  Dr. Whitley noted that, "she may need surgery on her right knee," and that there was "considerable swelling in the form of edema[57] in her left arm and hand."  (*Id*.).  Plaintiff reported that she was "under the care of Dr. Ramiz and Dr. Kim," who prescribed Alprazolam,[58] Hydro-APAP,[59] Buspirone,[60] and Lotrel for her.  (*Id*.).  Plaintiff also stated that she "takes Metformin twice a day" to stabilize her diabetes.  (*Id*). Chavira told Dr. Whitley that she had undergone surgery on her shoulder in May 2005, due to "poor circulation," and that she could not "lift anything including [her] arm."  (*Id*.).  Dr. Whitley reported that "the presence of neuropathy[61] is quite evident."  (Tr. at 254).  Finally, the psychologist recounted that Chavira had "no history of psychiatric hospitalizations."  (*Id*.).

Dr. Whitley reported that Plaintiff had previously "worked at Triumph Hospital in housekeeping," but that she "stopped working there in 2005 because of orthopedic problems." (Tr. at 254).  Plaintiff stated that, "[a]round the house," her daughter helped her bathe and dress. Her daughter also cooked the meals, washed the dishes, and did the laundry.  (Tr. at 254). Chavira reported that she has "some friends that visit" and that she attends church.  (*Id*.). Plaintiff also told Dr. Whitely that she "goes to the mall," and "occasionally, goes out to eat."

---

[57] "Edema" is "the abnormal accumulation of fluid in interstitial spaces of tissues."  MOSBY'S at 535.

[58] "Alprazolam is used to treat anxiety disorders and panic disorder (sudden, unexpected attacks of extreme fear and worry about these attacks)."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0000807/ (last visited February 19, 2012).

[59] "Hydro-APAP" appears to be an abbreviation for  hydrocodone and acetaminophen.  "Acetaminophen (sometimes abbreviated as APAP) is contained in many combination medicines."  Drugs.com, http://www.drugs.com/lortab.html (last visited February 19, 2012).  "Hydrocodone is in a group of drugs called narcotic pain relievers. Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone."  *Id*.

[60] "Buspirone is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000876/ (last visited February 19, 2012).

[61] "Neuropathy" is "inflammation or degeneration of the peripheral nerves, such as that associated with lead poisoning."  MOSBY'S at 1104.

(Tr. at 254-55).   Although Chavira has a driver's license, she does not drive often because it makes her "nervous" and her "mind wanders."  (Tr. at 254).

Dr. Whitley found Chavira's "ability to concentrate [] to be diminished."  (Tr. at 255). He explained that Plaintiff "would get on task," and "seem[] to be generally lost and easily overwhelmed."  Dr. Whitley noted that "[t]here was some loss of focusing," and that this loss of focus also appeared to be "going on at home," based on Plaintiff's comments about driving.  (Tr. at 255).  Dr. Whitley reported that, during the exam, Chavira  was "cooperative and compliant," but "relatively somber."  (Tr. at 256).   He found Plaintiff's "psychomotor activity" to be unremarkable," but added that, "if anything, it appeared … rather lethargic." (*Id.*).  Dr. Whitley determined there to be "no looseness of associations, tangential thinking, and/or circumstantiality," but he added that Plaintiff's "[a]bstracting ability was rather constrictive." (*Id.*).  Dr. Whitley explained that, with regard to the proverb, "*do unto others*," Chavira stated, "Do things for other people," and that "[w]ith regard *to all that glitters is not gold*, she did not know."  (*Id.*).  Chavira told Dr. Whitley that she heard voices, and stated that she "heard the voices" on her way to see him that day.  (Tr. at 256).

Overall, Dr. Whitley found Chavira to be "subdued," with a "clearly depressed" mood. (Tr. at 256).  He reported that Plaintiff "talked about her loss of interest and anhedonia.  She talks about sleep disturbances, loss of appetite, psycho motor lethargy, decrease in energy, difficulty in concentration and there is a history of suicidal ideations and gestures.  The last gesture was about 1992."  (*Id.*).  In addition, Dr. Whitley stated that,

> The patient's sensorium was clear.  She was not confused.  She knew where she was and the general purpose of the testing … She could count from one to ten without error.  When she was asked the days of the week, she stated interestingly enough "Tuesday, Wednesday, Thursday, Friday, Saturday, Sunday, and Monday. When she was asked to count backwards from 20 to 0, she omitted 12 and 11. When she was asked to spell the word WORLD, she spelled it *word*, and in

> reverse, *dorw*.  She did not attempt serial 3's and serial 7's … The patient reported that if she found an envelope in the street she would "I don't know.  I would throw it away."  If she saw smoke and fire coming from her home, she would … call [her] daughter."  Anything else?  "Get out."

(Tr. at 256-57).  Dr. Whitley "hypothesized that [Chavira's] level of cognitive functioning [wa]s probably in the low average to borderline range."  (Tr. at 257).  He found Plaintiff to have "Mood disorder due to a general medical condition," and "Body Dysmorphic[62] Disorder," which was "secondary to [her] radical mastectomy."  (*Id*.).  Dr. Whitley assessed Plaintiff with a GAF of 45.[63]  In sum, he found Chavira's "prognosis" to be "very guarded."  (Tr. at 258).  Dr. Whitley concluded that, "[w]ithout the medical treatment that she needs, the chan[c]es of her being able to profit from some type of adult remedial training does not appear to be a good alternative at this particular point."  (*Id*.).  He then stated, "She is motivated.  She wants to work.  She needs the money and has a good work history[,] but she simply can't do it."  (*Id*.).

The following month, on July 7, 2006, Margaret Meyer, M.D. ("Dr. Meyer") completed a "Psychiatric Review" of Plaintiff for the Social Security Administration.  (Tr. at 237-49).  Her assessment spanned the period from May 1, 2005, through July 6, 2006.  (Tr. at 237).  Dr. Meyer found Plaintiff to have impairments that were "[n]ot [s]evere."  (Tr. at 237).  In particular, she found Plaintiff to suffer from the "Affective Disorders" of "[d]epressive syndrome characterized by … [a]nhedonia[64] … [a]ppetite disturbance with change in weight, [] [s]leep disturbance, []

---

[62] "Dysmorphogenesis" is "the development of ill-shaped or otherwise malformed body structures."  *Id*. at 526.
[63] The GAF scale is used to rate an individual's "overall psychological functioning."  AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994).  The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status.  *See id*.  A GAF of 41-50 indicates "serious symptoms (*e.g*., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (*e.g*., no friends, unable to keep a job)."  *Id*.
[64] "Anhedonia" is "the inability to feel pleasure or happiness in response to experiences that are ordinarily pleasurable.  It is often a characteristic of major depression."  MOSBY'S at 93.

and [p]sychomotor agitation or retardation."[65]  Dr. Meyer also reported Plaintiff to suffer from "[b]ody [d]ysmorphic" disorder, under Listing 12.07 for "Somatoform Disorders."[66]  Dr. Meyer observed Plaintiff to have "mild" limitations in her "activities of daily living"; her ability to "maintain[] social functioning"; and her ability to "maintain[] concentration, persistence, or pace."  (Tr. at 247).  Finally, Dr. Meyer remarked that Dr. Whitley's assessment of Plaintiff's GAF as 45 was a "gross underestimate," and she concluded that Chavira's "allegations [were] not wholly supported" by the medical evidence.  (Tr. at 249).

Finally, there are records from the Texas Disability Determination Services, which indicate that Plaintiff missed three scheduled exams on February 7, February 12, and March 7, 2007.  (Tr. at 384, 386, 379-80).

### Educational Background, Work History, and Present Age

At the time of the administrative hearing, Chavira was 43 years old.  (Tr. at 31*)*.  She had an eleventh grade education and prior work experience as a custodian and a "companion," a position which is similar to a home health aide.  (Tr. at 58, 129, 134).

### Subjective Complaints

Before the ALJ, Chavira testified that she had been treated for depression since 1998.  (Tr. at 33).  In 1998, she took Paxil to treat her depression, and she stated that she "still tak[es] medication for [] depression today."  (*Id.*).  Chavira also reported that she suffered a stroke in 1998, which causes her left arm to be "weak," that it "shakes a lot," and she cannot lift it "above

---

[65] "Psychomotor retardation" is "a generalized slowing of motor activity related to a state of severe depression." MOSBY'S at 1348.

[66] "Somatoform disorder" pertains to "any group of disorders, characterized by symptoms suggesting physical illness or disease, for which there are no demonstrable organic causes or physiologic dysfunctions.  The symptoms are usually the physical manifestations of some unresolved intrapsychic factor or conflict."  *Id.* at 1513.

[her] head." (*Id.*).  Chavira also stated that she "can't pick up anything with her left hand, like pots or dishes[, because] [t]hey fall." (*Id.*).

Plaintiff acknowledged that she "tried to work a little bit in [20]07," but she only earned $4627.15.  (Tr. at 34).  At that time, Plaintiff was working for a home health company, as a "sitter" for her grandmother.  (Tr. at 34-35).  Plaintiff testified that she did not "pick [] up [her grandmother] and move her," nor did she "administer any medication to her."  (Tr. at 36, 49).  Instead, Chavira explained that she would "[j]ust sit[] with [her] grandmother most of the time, all the time.  Like, if she [would] go to sleep[,] [I would] fall asleep with her."  (Tr. at 34).  Plaintiff stated that she did this for two to three hours each day, but that she had to quit due to "her own health problems."  (Tr. at 36, 49).

Among those health problems was an "abdominal wall abscess," for which she was hospitalized.  (Tr. at 36).  Plaintiff testified that she was also diagnosed as suffering from diabetes, for which she took medicine.  (Tr. at 37).  Chavira testified further that she had lower back pain that "hurts very bad."  (Tr. at 38).  Because of that pain, Plaintiff reported an inability to "sit comfortably or lay down."  (*Id.*).  Plaintiff added that the pain also "goes through [her] leg" and "vibrates her legs," so that she "can't stand up long," and she sometimes loses her balance.  (*Id.*).

Plaintiff also claimed to "have damage in [her] neck from [] the breast cancer."  (*Id.*).  She stated that, "When they did surgery on my [] breast they took 7 -- 27 lymph nodes and it did damage … in my neck."  (*Id.*).  Plaintiff added that she "went through chemotherapy," but that she is "fine" now.  (Tr. at 39).  Chavira testified that she has pain in her "left [arm] only," and that her "right arm's not really affected."  (Tr. at 39).  She also testified that she has "pain with her right knee."  (*Id.*).  In describing that pain, Plaintiff testified that "it comes out of place when

[she is] walking … and then it just [] comes back.  So it's just very severe pain, like, tingling down … [and] sometimes it get[s] numb."  (Tr. at 40).   Because of the knee pain, she "[s]ometimes" uses a cane "at home," or to "walk to the store."  (*Id.*).  Plaintiff told the ALJ that although she "hear[s] voices," she has never sought treatment for that.  (Tr. at 50).

Plaintiff then testified about her hypertension and blood pressure.  (Tr. at 40).  She stated that her doctors would "give [her] samples[,] because the medicine is too expensive and [she] can't afford it."  (*Id.*).  For pain medication, she used "Neurontin," as well as Tylenol and Advil. (*Id.*).  Plaintiff testified that, when her pain gets "severe," she "go[es] to the hospital."  (Tr. at 41).  Plaintiff stated that she takes "Diaprikson (phonetic)," and Xanax" for depression.  (*Id.*).

Chavira also claimed to have "problems being around people."  (Tr. at 41).  She stated that when she is in a "crowd," which she defined as "[a]bout three" or "four" people, she "go[es] outside" or to another room.  (*Id.*).  Plaintiff reported that, most of the time, however, she stayed by herself, watching TV.  (*Id.*).  She testified that she occasionally "hear[s] voices" at night, because she cannot sleep.  (Tr. at 41-42).  Chavira attributed her difficultly in sleeping to "her neck" and "everything just hurt[ing]."  (Tr. at 42).

Plaintiff discussed her past suicide attempts and stated that she attempted to "cut [her] veins off."  (Tr. at 42).  She told the ALJ that her most recent suicide attempt was in 2007.  (*Id.*). Chavira testified that, although the medication helped her, she did not have "enough money to get them," and that her medicine "ke[pt] [her] from sleeping."  (Tr. at 42-43).

Chavira stated that her children drive her around, because she has a driver's license, but she does not drive, because her nerves are "bad," and she gets "anxiety attacks often."  (Tr. at 43).  During an anxiety attack, her blood pressure "goes [] high," she "shake[s]," and she has a "[h]ard time breathing."  (*Id.*).  These episodes last about "an hour or two" and occur "about

two" or "three times a month." (*Id.*). Plaintiff also testified that she "do[es]n't eat like she used to," and that she sometimes forgets to eat and must be reminded to do so. (Tr. at 44).

In describing her "average day," Plaintiff testified that, assuming that she "slept through the night," she "wake[s] up early, about 4:30, [or] 5:00." (Tr. at 44). She watches television, her daughter fixes her breakfast and dinner, and then Chavira and her grandmother simply "look at each other." (Tr. at 44-45, 47). If the television "bother[s]" her, she "turn[s] the radio on or go[es] to [her] room." (Tr. at 45). Chavira claimed to "sit down … about two or three hours," and then "walk because [her] back hurts." (*Id.*). Plaintiff stated that when she walks, she goes only to "the parking lot and come[s] back." (Tr. at 45). Chavira repeated that, after "too much walking," she "trip[s] over." (*Id.*). This "tripping" occurs because of "numbness in her feet," that "stick[s] like needles" and is "very hot." (Tr. at 46). Chavira testified that she can walk about "half a block," before she has to sit for "[a]bout 20 or 30 minutes," before "get[ting] up and walk[ing] again." (Tr. at 46). Plaintiff stated that she cannot "lift anything with [her] left" hand, but that she can lift a gallon of milk with her right hand. (Tr. at 46-47). She told the ALJ, however, that she could not lift the gallon "over and over again, [] for a third of a workday." (Tr. at 47).

Plaintiff testified that she was unable to do "anything around the house," but that she waters "the plants inside." (Tr. at 50, 52). Chavira claimed that her "mind wanders," and that she has "gets distracted," when trying to complete a task. (Tr. at 48). Plaintiff told the ALJ that she usually "go[es] to bed" at 10:00 at night, but that she "toss[es] and turn[s]," and "can't sleep sometimes." (Tr. at 52). Plaintiff stated that she has had difficultly in sleeping for "about three years," but that she does not "take anything … to try to help [herself] sleep." (Tr. at 52).

Chavira testified that she lives with her grandmother and two of her children.[67]  (Tr. at 51).  Plaintiff told the ALJ that she does not have any visitors, but that friends call her daily on the telephone.  (Tr. at 51).  Chavira also told the ALJ that her friend, Daisy, "takes [her] out to eat sometimes," or "to the store."  (Tr. at 51).  Plaintiff testified that her son takes her to the movies, "every Saturday," and that she attends church at Lakewood with her children, "every other Sunday."  (Tr. at 47, 52).  Chavira stated that her children do the grocery shopping, cleaning, and take her out to eat about "once a week."

Plaintiff testified that Dr. Patil is her "family practice doctor," and that he treats her for hypertension, but she also "see[s] him in the hospital."  (Tr. at 48).  Chavira stated that Dr. Kim is her neurologist and that she sees him approximately "once a month."  (Tr. at 48, 53).  Plaintiff reported that her last MRI was done at Parkway Hospital "about six months ago."  (Tr. at 49).  When her attorney asked if there was anything else she wanted to tell the judge about "why [she] c[ould]n't work,"  Chavira responded, "I'm just saying that I can't work due to my arm and my

---

[67]   The ages of Plaintiff's children are unclear.  In his decision, the ALJ stated that "the claimant lived with the youngest two of her four children, ages 24, 22, 16 and 15."  (Tr. at 21).  However, at the hearing, Plaintiff testified as follows:

> Q      You're still with, living with your grandmother?
> A      And my daughter and my children, two kids.
> Q      How old are the kids?
> A      My daughter's 17 and 28?
> WTN:   27.
> CLMT:  27.  And Michael --
> WTN:   (INAUDIBLE) 23.
> CLMT:  23
> Q      So, they -- are there – is there any children living in the house –
> A      No.
> Q – under age 18? ...
> CLMT:  Just my daughter.

(Tr. at 50-51).  Finally, on a Texas Disability Determination Services questionnaire, Plaintiff responded that she "takes care of" two children, whose ages are "16" and "15."  (Tr. at 176).

back and my diabetic and, my think[ing] is no good, … not good.  And I've just been sick."
(*Id.*).

> The ALJ then asked Plaintiff the following question:

> [I]f there was a job where you, where you could sit when you, when you wanted
> to or you, if you felt like standing … you could do that too, and let's just say it
> was, [] simple … where you didn't have to make a lot of judgments or anything
> like that, what would prevent you from doing something like that?

(Tr. at 53).  Plaintiff answered, "I just can't.  I just couldn't do it."  (Tr. at 53).  The ALJ asked if
she could tell him exactly "what would prevent her from doing" such work.  (Tr. at 53).  Plaintiff
responded that it was "the state of mind of the way [she] feel[s]."  (Tr. at 53).  Plaintiff testified
that she had not worked since 1998, "[b]efore [she] got sick from cancer."  (Tr. at 59).

### Testimony from Plaintiff's Son

> Plaintiff's son, Ruben Barbeda ("Mr. Barbeda), then testified before the ALJ, stating that
he lives with Chavira, and that he works as a "[h]ome [h]ealth
[a]gency."  (Tr. at 53-54, 173).  Mr. Barbeda testified that his mother was treated for "depression
and anxiety," but that "it's gotten worse."  (Tr. at 54).  Mr. Barbeda stated that he attended
Plaintiff's last visit to Dr. Kim, and that he told the doctor that Chavira has "Bipolar Disorder."
(Tr. at 54).  Mr. Barbeda explained that,

> [S]he gets really angry and secludes herself and … argues and then, five minutes
> later she's … a whole different person where she's calmed down completely.  …
> [T]he next morning she's, [] a whole new person.  She's lovable …, etcetera.
> Then it just, back to her -- she secludes … herself a lot to where she's lost a
> drastic amount of weight; … me and my brothers and sisters … don't see her
> healthy no more.  … [W]e're worried about her.

(Tr. at 54-55).  Mr. Barbeda testified that his mother was not "mentally stable any more.  She's
very forgetful and she can't even drive."  (Tr. at 55).  He also reported that Plaintiff has "crying
spells" daily.  (Tr. at 55).  Plaintiff's son testified that Chavira is no longer a "social person," and

"doesn't like to go anywhere."  (Tr. at 55).  Mr. Barbeda told the ALJ that, although he and his

brother take Plaintiff to the movies "[e]very now and then," she usually "gets aggravated in there

after a while," and they have to "leave during the movie."  (Tr. at 56).  He reported that,

> [Chavira] wants to concentrate on the movie[,] but at the same time she's concentrating on other things.  She'll worry about my grandmother or she'll just sit there and she'll just say, I need to get out o[f] here. … I'm uncomfortable or she'll just -- and that's when an argument starts.

(Tr. at 56).  Mr. Barbeda testified that he gives his mother Tylenol or Advil for minor pain, such

as headaches.  (Tr. at 56-57).  He stated, however, that sometimes Plaintiff has back pain, which

causes her to cry.  (Tr. at 57).  When she is "in a lot of pain," and it gets "severe," Mr. Barbeda

reported that he "take[s] her to the hospital."  (Tr. at 57).  But, those hospital trips cause him

concern, because,

> [they] have no health insurance.  So we'll try to pay for the E.R., give the E.R. a deposit or something and then whatever they c[an] do for her they can.  And the doctor will do his examination.  And sometimes they'll want to admit her[,] but I think the majority of the time they don't.  It's due to the fact that, [she's] … not insured.

(Tr. at 57).  Mr. Barbeda testified that he took his mother to the hospital twice in the last

six months, and that one visit was because of her "recurring abscess or staph infection."

((Tr. at 57).

### Expert Testimony

At the hearing, the ALJ also heard from Mr. Pettingill, a vocational expert witness.  (Tr.

at 58).  Mr. Pettingill stated that Plaintiff's work as a "companion," in 2007, was classified as

"semi-skilled work," and "is customarily at the light exertional level."  (Tr. at 58).  He explained

that a "companion" was "similar to a home hea[l]th aide except for the fact that it is performed at

the light exertional level."  (Tr. at 58).  The ALJ then posed a series of hypothetical questions to

Mr. Pettingill.  (*Id.*).  That exchange is set out below:

Q      [C]onsider a person of Claimant's age, education, and work history, …
[with] a residual functional capacity for light work, [and] … limit[ed] to
occasional public contact, simple one and two-step job instructions, and no
overhead lifting with the … left non-dominant arm and just occasional
overhead reaching.  Would such a person be able to perform the past
relevant work?

A      Your Honor, the work of a companion is considered semi-skilled by the
Department of Labor because it does involve some judgment regarding
administration of medications and just in general good judgment when
dealing with ill or elderly people.  And if … an individual could only follow
simple one and two step job instructions, I would be of the opinion that it
probably wouldn't be a good idea to, to place them in that, in that position if
that was the situation.  And I notice [that] … she didn't administer any
medications but … customarily a person would … have to.

Q      Okay.  Would there be any jobs?

A      Yes, sir.  There would be unskilled occupations … that a person with those
limitations could perform… [A] [s]mall products assembler.  There are
about 1,000 positions in the region and about 100,000 nationally.  A laundry
folder.  There are about 400 positions in the region and about 50,000
nationally…. [An] assembler of lawn and garden equipment.  And in the
region [there] are about 200 positions and about 30,000 nationally.

(Tr. at 59-60).  The ALJ then asked Mr. Pettingill to consider "the same limitations as before,"

but "with sedentary work."  (Tr. at 61).  The expert witness testified that, because Plaintiff's

"past work was light work," that she "would not be able to return to that."  (Tr. at 61).  The

expert witness then responded with examples of jobs that existed at "the sedentary level, with the

same non-exertional[]" limitations that the ALJ had previously posed.

A      Examples would be an order clerk.  In the region there are about 500 and
about  50,000 nationally  …  Another assembly position, … [a]n example would
be a final assembler in the optical goods industry.  In the region there are about
300 and about 50,000 nationally.  And a third example, a credit clerk … And in
the region there are about 900 and about 100,000 nationally.

(Tr. at 61-62).  Mr. Petting then testified that "region" was defined as "the Gulf Coast

region," which "includes Harris County and the 10 surrounding counties."  (Tr. at 62).

The ALJ asked Mr. Pettingill whether any jobs existed at "either [] the light or

sedentary level," if a person's "non-dominant hand" was "restricted to … only performing

fine manipulation." (Tr. at 62). Mr. Pettingill testified that such a limitation "would affect" the "assembly positions" that he had named previously. (Tr. at 62). For that reason, "the small products assembler," "the final assembler," and "the lawn and garden equipment" assembler positions "would have to [be] stri[c]ke[n]." (Ttr. At 63). Mr. Pettingill then testified that "the order clerk or the credit information clerk" positions "could be performed." (Tr. at 63). He also told the ALJ that the "laundry folder" position "could still be done." As to that job, Mr. Pettingill stated that a person with the stated limitations could fold towels or sheets, because "[t]hat's more of a gross manipulation." (Tr. at 62). Finally, the following exchange occurred between the ALJ and Mr. Pettingill:

> Q     And what if a person, even with … all the limitations I've already given you before, be it light or sedentary, if they are unable [] physically or mentally to sustain an eight hour day; that is they would require more than the, than the standard number of breaks in a day for whatever reason, either fatigue or inability to concentrate, would they be able to perform any jobs in the national economy?
> A     Not in my opinion.
> Q     And they wouldn't be able to perform any of the jobs you cited, right?
> A     No, sir, not in my opinion.

(Tr. at 63).

Chavira's attorney then questioned Mr. Pettingfill. (Tr. at 64). Mr. Radney asked him the following questions:

> Q     I have just a third hypothetical that if you could assume for me an individual that could sit for a cumulative total of four hours in an eight-hour workday and stand for a cumulative total of two hours in an eight-hour workday, what jobs would such an individual be able to perform?
> A     In combination, Counsel, … I assume what you're saying is the person in combination would only be able to sit or stand six hours in a[n] … eight-hour day?
> Q     Yes.
> A     [] I would be of the opinion that there wouldn't be [] any jobs or occupations in a competitive environment that would be available.

(Tr. at 64).

***The ALJ's Decision***

Following the hearing, the ALJ made written findings on the evidence.  (Tr. at 13-26).

From his review of the record, he determined that Chavira suffers from the following "severe

impairments":

> [D]iabetes mellitus, type 2, with peripheral vascular insufficiency; hypertension,
> with chest pain; gastritis and gastroesophageal reflux disease; generalized pain
> syndrome involving the cervical and lumbosacral spine; left shoulder pain, status
> post a history of subclavian blood clot in the left upper extremity following breast
> lumpectomy and chemotherapy in 1994 and 1995; obesity; and situational
> depression and generalized anxiety, with possible body dysmorphic syndrome
> related to the lumpectomy, secondary to history of cancer and treatment.

(Tr. at 15).  However, he wrote that after "careful consideration of the record," he found that

Chavira did not have "an impairment or combination of impairments that meets or medically

equals one of the listed impairments."  (Tr. at 16, 18).  The ALJ described Plaintiff as having

"the residual functional capacity to perform sedentary work … with no overhead lifting;

occasional overhead reaching with the left arm; performing only simple, repetitive instructions;

and occasional public contact."  (Tr. at 18).   The ALJ also found that "there are jobs that exist in

significant numbers in the national economy that the claimant can perform."  (Tr. at 25).   With

that conclusion, the ALJ denied Chavira's application for benefits. (Tr. at 26).

Before this court, Plaintiff argues that the ALJ "[i]mproperly evaluated [her] mental

impairment."  (Plaintiff's Motion at 4).  More specifically, Chavira claims that the ALJ did not

consider her "inability to afford medical treatment" and that he "mischaracterize[ed]" evidence

regarding her daily activities.   Plaintiff also complains that the ALJ rejected Dr. Whitley's

opinion, and that he "[f]ailed to consider Plaintiff's mental impairments under Listing 12.07,

"pertaining to Somatoform Disorders."  (*Id*. at 4-6, 8, 10).  Next, Chavira argues that the ALJ did

not consider the impact of her obesity, and that he did not discuss the side effects from her

medication.  (Plaintiff's Motion at 15-16).  Finally, Plaintiff complains that the ALJ made an "improper step five finding," because of the flawed hypothetical question he posed to the vocational expert.  (*Id*. at 17).  She further contends that the ALJ erred at step five, because he did not "perform a function-by-function analysis of Plaintiff's RFC," and "assess her ability to perform these functions on a regular and continuing basis."  (*Id*. at 17-18).  Defendant, on the other hand, insists, that the ALJ "properly evaluated Plaintiff's claim," and that substantial evidence supports his decision to deny her benefits.  (Defendant's Motion at 3-10).

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it.  *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496).  Further, a finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

*The ALJ's Duty to Perform a Function-by-Function Analysis of Plaintiff's RFC*

Plaintiff argues that the ALJ "made an improper step five finding," because he did not "perform a function-by-function analysis of Plaintiff's RFC and [] assess her ability to perform these functions on a regular and continuing basis."  (Plaintiff's Motion at 17).  In making this argument, Plaintiff does not identify any regulation by number, however, Defendant insists that, "SSR 96-8p does not require an ALJ to discuss all of a claimant's abilities on a function-by-function basis."  (Defendant's Response at 9).  The Commissioner maintains that the ALJ fully complied with SSR 96-8p, because he fulfilled the "Narrative Discussion Requirements."  (*Id*.).

To determine "whether the ALJ applied the proper legal standards in making" his decision, it is necessary to review the relevant SSA regulations.  *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496).  SSA Regulation 96-8 "clarifies the term 'RFC'" and details "the elements" that the ALJ must consider in making his findings.  SSR 96-8, 1996 WL 374184 (July 2, 1996). The regulation states that,

> The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. At step 4 of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of "sedentary," "light," "medium," "heavy," and "very heavy" work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it.
>
> …
>
> At step 5 of the sequential evaluation process, RFC must be expressed in terms of, or related to, the exertional categories when the adjudicator determines whether there is other work the individual can do. *However, in order for an individual to do a full range of work at a given exertional level, such as sedentary, the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual[']s capacity to perform each of these functions* in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level.

*Id*. at * 3 (emphasis added); *see also Myers v. Apfel*, 238 F.3d 617, 620-21 (5th Cir. 2001).

This regulation also outlines certain "Narrative Discussion Requirements" that are necessary to "describe[e] how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."

*Id*. at *6-7.  This "Narrative Discussion" requires that,

> In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at * 7 (internal citations omitted).

In this instance, the ALJ used the medical evidence to support his decision, as well as to resolve inconsistencies, and to reject certain of the claimant's subjective assertions.  (Tr. at 13-26).  The ALJ referenced Plaintiff's frequent visits to her treating physicians, Drs. Patil and Kim. (Tr. at 19).  He found that, "[i]n December 2002, the claimant complained of chest pain," but that "[c]ardiac involvement was ruled out on diagnostic testing," and she had a "normal" chest x-ray. (Tr. at 19).  Next, the ALJ underscored the fact that Chavira "had been scheduled to undergo a medical consultative examination in February 2007, but failed to submit for the examination." (Tr. at 19).  He noted further that Dr. Kim "recommended that the claimant go for home health care evaluation and to an 'oriental medical doctor for acupuncture therapy.'"  (*Id.*).  He observed that Dr. Kim also "referred [Chavira] for an MRI of the cervical and lumbar spine, a series of x-rays, ultrasounds of the abdomen and pelvis, and a complete laboratory blood and urine screening."  (Tr. at 19-20).  The ALJ stated that, Chavira "does not appear to have undergone any of the recommended tests or treatments."  (Tr. at 20).  The ALJ then discussed Plaintiff's October 2007 hospitalization for the infection in her right arm. (Tr. at 20).  He found that "[a]n abdominal ultrasound revealed a slightly enlarged liver, but was otherwise unremarkable," and that "a gastroscope examination confirmed gastritis and gastroesophageal reflux disease." (Tr. at 20).  Finally, the ALJ summarized Plaintiff's objective medical evidence as follows:

> Additionally physical examination was also noted to include 'motor and sensory system' decreases in the lower extremities, but this appeared to be attributed more to the diabetic peripheral neuropathy than the lumbar spine.  As to the claimant's assertion of extreme left arm weakness, not only is such a degree of limitation not reflected in the evidence, she was observed at the hearing to use both arms to lift herself out of her seat.  It is also noted that Dr. Kim never mentioned in his progress notes that the claimant had lost the use of her left arm.

> Based on the claimant's diagnosis of diabetes, with signs consistent with peripheral neuropathy at least in the lower extremities, symptoms consistent with diabetic peripheral neuropathy could reasonabl[y] be expected to produce symptoms involving the upper and lower extremities.  The balance of the medical evidence does not, however, support the severity of symptoms asserted by the claimant.  Likewise, some pain and impairment involving the left upper extremity could reasonabl[y] be expected based on the claimant's history of [a] blood clot in the left arm following the left breast lumpectomy, radiation, and chemotherapy in the mid 1990's.  Again, the claimant's assertion of an almost complete inability to use her left arm is simply not supported in the medical evidence.

(Tr. at 23-24).

In discussing Plaintiff's subjective complaints, the ALJ noted that, "[a]fter careful consideration of the evidence," he found that, although Chavira's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the finding that she can perform restricted sedentary work.  The ALJ observed that,

> When asked about work, the claimant denied any work in 2005, stressing that she had last worked in 1998.  It is noted that the claimant reported to the consultative examiner that she had last worked in 2005 as a housekeeper.  When pressed, the claimant eventually admitted that she worked in 2007 as a sitter; she stated that she worked for her grandmother, but had been employed by Girling's Home Care.  The claimant described her daily activities as including watching television and attending church.  She estimated that she can sit 45 to 60 minutes, but walk only to the parking lot secondary to needles in her feet.  She can lift a gallon of milk with her right hand.  The claimant's son testified and stressed that the claimant secludes herself and has daily crying spells.  The son believes the claimant's depression has gotten worse.

(Tr. at 22- 23).  The ALJ then questioned the fact that Chavira "never sought any formal mental health treatment over the past 10 to 15 years," if her "symptoms [we]re as severe as asserted." (Tr. at 24).

Next, the ALJ provided his reasons for discrediting Dr. Whitley's opinion.  In evaluating Dr. Whitley's opinion, the ALJ first noted Plaintiff's complaints to the psychologist that her

"depression and panic attacks" began after "her 1994 radical mastectomy and subsequent chemotherapy and radiation." (Tr. at 21). The ALJ then highlighted the fact that, "the medical progress notes reflect that the claimant underwent a left breast lumpectomy, and not a radical mastectomy." (Tr. at 21). He commented further that, "A physical examination in October 2007 confirmed that the claimant's left breast was smaller than on the right, but not surgically missing." (Tr. at 21). From his assessment of Dr. Whitley's consultation, the ALJ determined that,

> Based on the entire record, the medical opinion of Dr. Whitley has been accorded very little weight as the majority of his conclusions appear to have been based solely on the claimant's subjective assertions and have no basis in the objective evidence. To begin, Dr. Whitley is not qualified to conclude that the claimant has been physically incapable of working since 2005 due to [a] complete inability to use her left upper extremity and/or other physical impairments. … Likewise, Dr. Whitley['s] remark about the claimant's good work history is also not supported by any objective documentation as the claimant's earnings record reflect very little work since the 1980's and she admits to little to no work at least since 1995. As to Dr. Whitley's suggest[ion] that the claimant could not be retrained without "needed" medical treatment, it is unclear if he was referring to medical or mental health treatment. Regardless of which type of treatment he was referring, Dr. Whitley does not appear to have reviewed the claimant's medical records to assess the treatment she had received over the years nor did he question her as to why she had never sought this "needed" treatment over the past 10 or more years.

(Tr. at 22).

From this discussion, the ALJ appears to have complied with the "Narrative Discussion" requirements in SSR 96-8. SSR 96-8, 1996 WL 374184 (July 2, 1996). In this instance, the ALJ outlined his findings on Chavira's RFC based on the objective medical evidence of record, as well as her testimony. It is true that, in his decision the ALJ discounted some of her subjective symptoms and limitations, but he is clearly permitted to reject a claimant's complaints if he finds them to lack credibility. *Falco*, 27 F.3d at 164; *Herrera v. Astrue*, 406 Fed. Appx. at 905 (noting that although the "ALJ must consider subjective evidence of pain, ... it is within his discretion to

36

determine the pain's disabling nature"). Here, the ALJ made the reasons for his determination clear. The ALJ referenced, three times, the lack of objective evidence to document Plaintiff's lower back pain. (Tr. at 23-24). He also noted that her treating physician never concluded that she had lost the use of her left arm. (*Id.*). In addition, the ALJ pointed to numerous instances in which Chavira failed to seek the medical treatment or additional testing that her treating physician had recommended. (Tr. at 19-20). Although Chavira complains that the ALJ "failed to mention that her "visits with friends" occur only "via telephone," the evidence belies that statement. Plaintiff testified that her friend, Daisy, takes her "out to eat" or "to the store." (Plaintiff's Motion at 6); (Tr. at 51). Here, the ALJ has satisfied his burden to explain his reasons for discrediting Plaintiff's subjective statements about her limitations, and he has supported his decision with substantial evidence. *See Falco*, 27 F.3d at 164; *Haywood*, 888 F.2d at 1470; *Wingo*, 852 F.2d at 830.

Further, the evidence is clear that Dr. Whitley saw Plaintiff only one time. For that reason, he is not considered a treating physician and his opinion is not entitled to controlling weight. *Hernandez v. Astrue*, 278 Fed. Appx. 333, 338 n. 4 (5th Cir. 2008) (citing 20 C.F.R. § 404.1502); *see also Borne v. Astrue*, 2010 WL 3303804, at * 10 (E.D. La. 2010) (noting that, because the doctor saw the claimant only once, the physician was "*not* a treating physician as defined by the Commissioner's regulations and his opinion would *not* be accorded [] controlling weight." (emphasis in original)). Moreover, in his opinion, the ALJ did give credence to Plaintiff's treating physicians, Drs. Patil and Kim. (Tr. at 19-21). Because he did so, the Regulations do not require him to provide any explanation of his evaluation of Dr. Whitley's opinion. *See* 20 C.F.R. § 416.927(f)(2)(ii). Nevertheless, the ALJ did discuss Dr. Whitley's opinion at length. (Tr. at 21-22). Indeed, in Dr. Whitley's own report, he acknowledged that

Plaintiff "provide[d] her own history," and that "[t]here were no medical or school records available." (Tr. at 253). From that statement, it is apparent that much of his report consisted of Chavira's "subjective responses," which serves as an additional reason to accord Dr. Whitley's opinion less weight. *See* (Tr. at 22); *Greenspan*, 38 F.3d 232, 237-38 (5th Cir. 1994). For these reasons, the ALJ did not err in rejecting Dr. Whitley's opinion, and he has supported that decision with substantial evidence.[68]

Despite the substantial evidence that the ALJ used to support his decision, Plaintiff complains that he erred by not performing "a function-by-function analysis of Plaintiff's RFC" on her ability to work. (Plaintiff's Motion at 17) (citing *Myers v. Apfel*, 238 F.3d 617, 620-21 (5th Cir. 2001)). The United States Court of Appeals for the Fifth Circuit has found that "'[r]esidual functional capacity,' as it is used in the [SSA] Regulations, is a term of art which designates the ability to work despite physical or mental impairments." *Hollis v. Bowen*, 837 F.2d 1378, 1386 (5th Cir. 1988). To determine a claimant's RFC, an ALJ is required to consider any physical impairments, as well as evidence on "any limitations on the applicant's ability to work" provided by "physicians, the applicant, or others." *Id*. at 1386-87. But the law recognizes that "it may not be possible" to identify these limitations "without [an] initial function-by-function assessment of the individual's physical and mental capacities." *Myers*, 238 F.3d at 620 (citing SSR 96-8p, 1996 WL 374184, *3 (S.S.A. 1996)). To evaluate a claimant's physical

---

[68] It discussing Dr. Whitley's opinion, in an abundance of caution, it seems appropriate to discuss Plaintiff's fleeting claim that the ALJ was required to "fully and fairly" develop the record on any questions he had about Dr. Whitley's opinion. (Plaintiff's Reply at 5-6). As a general rule, in determining whether a disability exists, an ALJ "owe[s] a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Kane*, 731 F.2d at 1219). But a failure to do so is reversible error only if it results in prejudice to the claimant. *See Newton*, 209 F.3d at 456-57; *Ripley*, 67 F.3d at 557. The claimant "must show that, had the ALJ done his duty, []he could and would have adduced evidence that might have altered the result." *Kane*, 731 F.2d at 1220. Here, Chavira does not point to any additional evidence that might have led to a different outcome. (Plaintiff's Reply at 5-6). In the absence of a showing of prejudice, the ALJ did not err in failing to further develop the record. Plaintiff presents no basis for remand on this point.

capacities, the ALJ must consider "seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling," and each of these "must be considered separately." *Id*. (citing SSR 96-8p at *5).

In *Myers v. Apfel*, the ALJ determined that the claimant could not perform her past relevant work as a stage hand, but, at step five of the analysis, concluded that she could adjust to sedentary work and so was not disabled under the law. 238 F.3d at 620. To reach this conclusion, the ALJ relied on the opinion of a non-treating, non-examining medical expert witness, who had "based his conclusion that she met the requirements for sedentary work on an incomplete reading of the treating physicians' reports." *Id*. at 621. The ALJ found, from that witness's testimony, that the claimant "could sit, lift and carry ten pounds; would need a sit/stand option; and would need to stretch every thirty minutes." *Id*. Myers challenged the determination that she could adjust to sedentary work, arguing that it was not based on substantial evidence, because the ALJ did not consider all of the applicable strength requirements. *Id*. at 620. The Fifth Circuit agreed that the ALJ's findings did not support a conclusion that Myers could perform sedentary work, because his decision did not " fully address" whether she could stand, walk, push, or pull "on a regular and continuing basis." *Id*. at 620, 621. "[M]ost importantly," the court found that "the medical evidence as a whole," including reports from two of the claimant's treating physicians, indicated that she could not meet the requirements of sedentary work, and that "the ALJ failed to resolve the inconsistencies in the evidence." *Id*. Because the ALJ in *Myers* rejected the opinions from the treating physicians without good cause, the appellate court found that substantial evidence did not support his decision, and the case was remanded to the Commissioner for further consideration. *Id*. at 621, 622.

Here, in contrast, the ALJ gave weight to the reports from Plaintiff's treating physicians. (Tr. at 13-26).  In addition, he took time to resolve the inconsistencies in the medical evidence. (Tr. at 22-23).   Moreover, he evaluated the report from Dr. Rosenstock, who did assess Plaintiff's ability to perform the "seven strength demands," and who determined that Chavira was able to perform light work.  (Tr. at 224-31).  Because the ALJ found that Plaintiff could only perform sedentary work, with limitations, he disagreed with her opinion.  (Tr. at 24).  However, the Fifth Circuit has found that, in determining a plaintiff's RFC, an ALJ "employ[s] the legal standard set forth in *Myers* and SSR 96-8p," when he relies on an "examiner's function-by-function analysis of [the plaintiff's] exertional limitations."  *See Oneisha v. Barnhart*, 116 Fed. Appx. 1 (5th Cir. 2004).  For these reasons, the court is satisfied that the ALJ met his burden to show the absence of a disability.  *Myers*, 238 F.3d at 619; *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen,* 864 F.2d 340, 344 (5th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).   Further, Chavira has provided no evidence to contradict the ALJ's finding that she is capable of sedentary work, with the limitations he assigned.  And, "reversal and remand based on disregard of a social security ruling may occur only when the plaintiff also shows that prejudice arose from that error." *Zeno v. Barnhart,* No. 1:03–CV–649, 2005 WL 588223, at *10 (E.D.Tex. Feb.4, 2005) (*citing Hall v. Schweiker,* 660 F.2d 116, 119 (5th Cir.1981)).  On this record, Plaintiff has not raised a genuine issue of material fact on whether the ALJ failed to properly assess her ability to work.

Plaintiff also complains, however, that the ALJ erred in not "assess[ing] her ability to perform these functions on a regular and continuing basis."   (Plaintiff's Motion at 17).  Defendant contends that "the Fifth Circuit does not require that an ALJ make a specific finding

that a claimant can maintain a job unless 'the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms.'"   (Defendant's Response at 9) (citing *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003).  Defendant argues further that, the SSA regulations "do[] not require an ALJ to discuss all of a claimant's abilities on a function-by-function basis."  (*Id.*).

The Fifth Circuit first discussed the issue of a claimant's ability to maintain employment in *Singletary v. Bowen*.  798 F.2d 818 (5th Cir. 1986).  In that case, the court held that  "a finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time."  *Id.* at 822; *accord Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002) (extending holding in *Singletary* to cover physical impairments).   The Fifth Circuit later explained, however, that "nothing in [these cases] suggests that the ALJ must make a specific finding regarding the claimant's ability to maintain employment in every case."   *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003).  Instead, "[they] require a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms."  *Id.*  In other words,

> absent evidence that a claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of [residual functional capacity], we do not read *Watson* to require a specific finding that the claimant can maintain employment.

*Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003).

Here, the ALJ made no explicit findings on whether Chavira is able to maintain employment.  (*See generally* Tr. 13-26).  However, Plaintiff never claimed that her symptoms "waxed" and "waned," nor do the medical records support that allegation. (Tr. at 194-488).  In

41

fact, Plaintiff claimed that, as of May 1, 2005, she was "unable to work." (Tr. at 124). For these

reasons, no explicit finding on that point was required. *See Dunbar*, 330 F.3d at 672. Plaintiff

presents no basis for remand on this issue.

*Plaintiff's Inability to Afford Medical Treatment*

Chavira next complains that the ALJ "failed to consider that [her] lack of 'reasonable and

adequate mental health treatment' was due to the fact that she was not able to afford it."

(Plaintiff's Motion at 4). Plaintiff contends that "she sought any available treatment she could

find to deal with her symptoms, even if she was forced to obtain it through a non-specialist."

(*Id*.). Plaintiff highlights her own testimony that "she gets free samples of her medications

because they are too expensive, she cannot afford them, and she does not have a Gold Card."

(*Id*.). She also emphasizes her testimony "that the medications seem to help her mental

symptoms, "But like I said, I haven't had … enough money to get them." (*Id*.). In response,

Defendant argues that "Plaintiff presented no evidence indicating that she has unsuccessfully

attempted to obtain additional medical attention." (Defendant's Response at 2).

In support of her argument, Plaintiff points to the Fifth Circuit decision in *Lovelace v.*

*Bowen*. 813 F.2d 55 (5th Cir. 1987). In *Lovelace,* this circuit held that "[a] medical condition

that can reasonably be remedied either by surgery, treatment, or medication is not disabling. If

however, the claimant cannot afford the prescribed treatment or medicine, and can find no way

to obtain it, 'the condition that is disabling in fact continues to be disabling in law." *Id*., 813

F.2d at 59. In *Lovelace*, the plaintiff's physician found his hypertension to be "uncontrolled

despite treatment," and he prescribed five medications for him. *Id*. at 57. The plaintiff told his

doctor that he could not afford the prescriptions, and the physician reported that there was a

"good possibility" that the plaintiff's "condition 'could be benefitted a great deal if he were able

to buy his medication and take it properly.'" *Id*. In addition to case law, the SSA also provides

guidance on a claimant's purported inability to afford treatment.  Specifically, SSA Regulation 82-59 states that a claimant's inability "to afford prescribed treatment which he or she is willing to accept, but for which free community resources are unavailable," is a "[j]ustifiable cause" for not following prescribed treatment.  SSR 82-59, 1982 WL 31384 at * 4.  Those regulations, however, require the claimant to explore "[a]ll possible resources," such as "clinics, charitable and public assistance agencies, etc."  *Id*.  Further, "[c]ontacts with such resources and the claimant's financial circumstances must be documented."  *Id*.

In his decision, the ALJ noted, twice, that, Chavira "stressed that she uses only samples for her hypertension because she cannot afford the medication." (Tr. at 20, 23).  For that reason, it is clear that the ALJ considered Plaintiff's comments on her inability to afford treatment, as well as the objective medical evidence of record.  (Tr. at 13-26).  However, despite Plaintiff's financial situation, the record is replete with reports of medical treatment that she has received. (TR. at 194-488).  Other than one reference to Plaintiff receiving samples for a schizophrenia medication, "Zyprexa," the medical records do not document Chavira's inability to fill her multiple medications.  (Tr. at 435).  Further, Plaintiff has not identified any other particular reason that she was unable to seek mental health treatment, in addition to regular medical visits. (*See* Plaintiff's Motion; *see also* Plaintiff's Response).  Although "free community resources" exist in the Houston area, [69] there is nothing to document Plaintiff's "contacts" with these "possible resources."  *See* SSR 82-59, 1982 WL 31384 at * 4; *see generally Davis v. Astrue*, 2012 WL 524185, *9-10 (S.D. Tex. 2012) (holding that *Lovelace* "does not warrant remand," when the plaintiff "was able to attain medical care," and his argument was "vague," in that it did

---

[69] As one example, the court notes that the mission of "the Mental Health and Mental Retardation Authority of Harris County (MHMRA)," is to "provide or ensure the provision of services" to people "with mental disabilities … regardless of their ability to pay or third party coverage."  MHMRA, http://www.mhmraharris.org/MHMRA-Mission-Statement.asp (last visited February 24, 2012).

not "identify any particular medical condition for which [he] was unable to obtain medical treatment [] that render[ed] him disabled."). Finally, although Plaintiff specifically testified to her inability to afford medication to treat her hypertension, on August 26, 2006, Dr. Patil reported that Plaintiff's "mild hypertension" was "controlled with Lortel." (Tr. at 40, 198, 488). For these reasons, the ALJ satisfied his burden to support his decision with substantial evidence, and there is no reason to disturb those findings." *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496); *Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

*Obesity*

Next, Plaintiff argues that the ALJ "failed to adequately analyze the impact of Plaintiff's obesity on her ability to work." (Plaintiff's Motion at 15). Defendant counters that "the ALJ clearly considered Plaintiff's obesity, as he found it severe." (Defendant's Response at 7). Defendant also points out that "Plaintiff's argument consists largely of reciting speculative, possible limitations that may stem from obesity," and "fails to establish additional limitations" that it specifically imposed upon her. (Defendant's Response at 7).

On this matter, the Fifth Circuit has stated clearly that "[t]he law of this Circuit requires consideration of the combined effect of impairments." *Loza v. Apfel*, 219 F.3d 378, 399 (5th Cir. 2000). Indeed, it is error for an ALJ to evaluate the consequences of a claimant's individual impairments separately without considering their combined effects. *Id.* (citing *Scott v. Heckler*, 770 F.2d 482, 487 (5th Cir. 1985); *Strickland v. Harris*, 615 F.2d 1103, 1110 (5th Cir. 1980)). "The Act seeks to administer relief to the whole [wo]man, and not simply to serve as a vehicle for the separate clinical analysis of individual ailments." *Scott*, 770 F.2d at 487 (quoting *Dorsey v. Heckler*, 702 F.2d 597, 605 (5th Cir. 1983)). If an ALJ finds that "a medically severe

combination of impairments" exists, after a review of the record as a whole, then "'the combined impact of the impairments will be considered throughout the disability determination process.'" *Loza*, 219 F.3d. at 393 (quoting 20 C.F.R. § 404.1523).   In step four of this process, it is the claimant's burden to show that any impairments, singly or together, "interfered with" her ability to perform her past relevant work.   *Fraga v. Bowen*, 810 F.2d 1296, 1305 (5th Cir. 1987).   Absent such a showing, a court should not disturb an ALJ's "determination that these impairments were not disabling."   *Id.*

Here, Chavira never specified obesity as a limiting impairment before the ALJ. Notwithstanding that fact, he determined, independently, from his review of the medical records and the testimony presented at the hearing, that this condition is medically "severe."   (Tr. 15). He then found that this impairment, even when considered in concert with Plaintiff's diabetes, hypertension, gastritis, GERD, "generalized pain syndrome," left shoulder pain, and "situational depression and generalized anxiety," does not meet the disability requirements of the SSA listings.   (*Id.*).   Finally, he evaluated the effect of these "multiple severe impairments" on her ability to function, and concluded that "there are jobs that exist in significant numbers in the national economy that [Chavira] can perform."   (*Id.* at 15-25).   At no time did Chavira show evidence that her obesity caused an independent impediment to her functional capacity.   On this record, there was no reason for the ALJ to consider the obesity in isolation from Chavira's other impairments.   *See Loza*, 219 F.3d at 393, 399; *Fraga*, 810 F.2d at 1305; *Scott*, 770 F.2d at 487; *Dorsey*, 702 F.2d at 605.   Accordingly, Plaintiff's motion for summary judgment, on this issue, should be denied.

*Side-effects of medication*

Plaintiff also complains that "the ALJ's RFC finding … is void of any mention of the side effects caused by Plaintiff's medications." (Plaintiff's Motion at 16). Defendant responds that Plaintiff only cites her reports of side effects to the Agency and that she never complained of any side effects to her physicians. (Defendant's Response at 7-8). The Commissioner insists that "the ALJ was not required to consider side effects that did not merit reporting to Plaintiff's physicians." (*Id.* at 8).

This circuit has recognized that, "[u]nder the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate any pain or other symptoms." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1994) (citing 20 C.F.R. § 404.1529(c)(3)(iv)) (alterations in original). Side-effects from medication are deemed nonexertional limitations, "which may have a disabling effect" on a claimant. *See James v. Bowen*, 793 F.2d 702, 705 (5th Cir. 1986); *and see Crowley*, 197 F.3d at 199; *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995). To establish whether such a disabling effect exists, an ALJ must consider the claimant's subjective complaints "about the intensity, persistence, and limiting effects of [his] symptoms, and . . . will evaluate [his] statements in relation to the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4); *and see Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) ("[T]he law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints."). Indeed, "[t]he Act, regulations and case law mandate that . . . subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988). For this reason, an ALJ may reject a claimant's subjective complaints, as long as the reasons for so doing are made clear. *Falco*, 27 F.3d at 164.

Here, the medical record shows that Plaintiff never complained to her physicians of any medicinal side effects.  (Tr. at 194-488).  To the contrary, there are references that her medications are working well for her.  (Tr. at 198, 225, 488).  Moreover, the ALJ mentioned Plaintiff's medications, by name, at numerous points in his decision.  (Tr. at 18) (noting "Ativan, Paxil, Ambien, and Ultram"); (Tr. at 19) (noting "Diovan, Xanax, ASA, Toprol, Pravachol, and Nexium," as well as "Vicodin, Buspar, Lipitor, Restoril, and Nizoral cream"); (Tr. at 20) (noting "Levaquin, Phenegran, with Codeine, Vicodin, Buspar, Ambien, and Metformin," as well as "Neurontin").  For this reason, it is clear that the ALJ was aware of Plaintiff's prescription regimen.  In his decision, the ALJ evaluated "the entire record" and gave Plaintiff's "subjective assertions as much consideration as possible in the absence of objective evidence." (Tr. at 24).  He stated further that her "assertions relative to symptomatology … are not credible in that they are exaggerated, lack corroboration or substantiation in the medical evidence, and/or are at least partially the result of the failure to follow prescribed medication and/or treatment recommendations."  (Tr. at 24).  It seems clear then, that, as with Plaintiff's other subjective complaints, the ALJ found her reports of side effects to be unbelievable.  And, there was no objective medical evidence to support her claims.  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (holding that, the "Act, regulations and case law mandate that . . . subjective complaints be corroborated, at least in part, by objective medical findings").  Because the ALJ made clear his reasons for that decision, and because there is substantial evidence to support that finding, it need not be disturbed.

*Somatoform Disorder*

Plaintiff also claims that because the ALJ improperly credited Dr. Whitley's opinion as to her mental impairments, she meets the requirements of Listing 12.07, pertaining to Somatoform

Disorders.  (Plaintiff's Motion at 10).  The Commissioner responds that because "Plaintiff makes

no showing of marked limitations in any one domain ... remand for further consideration of

Listing 12.07 is not required."  (Defendant's Response at 6).

      The SSA regulations define "Somatoform disorders" as "[p]hysical symptoms for which

there are no demonstrable organic findings or known physiological mechanisms."  *See* 20 C.F.R.

Pt. 404, Subpt. P, App. 1, § 12.07.  To meet this listing, a claimant must exhibit "at least two of

the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

*Id*.

      To support her argument, Plaintiff points to the opinion from Dr. Meyer, the non-

examining State medical consultant.  (Tr. at 237).  In evaluating Plaintiff, Dr. Meyer reported

that Chavira suffered from "[b]ody dysmorphic" disorder, under Listing 12.07.  (Tr. at 237).

However, later in her report, Dr. Meyer observed Plaintiff to have "mild" limitations in her

"activities of daily living"; her ability to "maintain[] social functioning"; and her ability to

"maintain[] concentration, persistence, or pace."  (Tr. at 247).  For that reason, her assessment of

Plaintiff does not qualify as a diagnosis of Somatoform Disorder.  The "ALJ 'is entitled to

determine the credibility of medical experts as well as lay witnesses and weigh their opinions

accordingly.'"  *Greenspan,* 38 F.3d 232 (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th

Cir.1990); *see also* 20 C.F.R. Sec. 404.1527(c)(2) ("If any of the evidence in your case record,

including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent,

we will weigh all the other evidence and see whether we can decide whether you are disabled

based on the evidence we have."))  More importantly, the ALJ found Plaintiff to have only

"mild" limitations in daily living activities, and "moderate difficulties" in "social functioning," and "concentration, persistence, or pace." (Tr. at 16-17). It has already been established that his decision is supported by substantial evidence. For that reason, Plaintiff does not meet the requirements of Listing 12.07 and this point also does not require remand.

*Hypothetical question to vocational expert witness*

Finally, Plaintiff complains that the ALJ's hypothetical question to the vocational expert witness was flawed, because he "failed to properly evaluate all of Plaintiff's impairments." (Plaintiff's Motion at 17). Defendant counters that "the ALJ's hypothetical question to the vocational expert included only those limitations supported by the record and recognized by the ALJ." (Defendant's Response at 8). Fifth Circuit rulings are clear that, to support a non-disability finding, any hypothetical question that is posed to a vocational expert witness must "incorporate reasonably all disabilities of the claimant [that are] recognized by the ALJ" and that are supported by the objective medical evidence. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994); *and see Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000); *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988). The court has already determined that the ALJ's findings are supported by substantial evidence. For that reason, in his hypothetical question, the ALJ was entitled to include the limitations he found to be supported by the record, and to exclude those subjective complaints that he found to lack credibility. Plaintiff presents no basis for remand on this point.

**CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that Defendant's motion be **GRANTED,** and that Plaintiff's motion be **DENIED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 29th day of February, 2012.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**